UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

|  |  |  |
|---|---|---|
| In re:<br><br>ATLAS AIR WORLDWIDE HOLDINGS, INC., ATLAS AIR, INC., POLAR AIR CARGO, INC., AIRLINE ACQUISITION CORP. I, AND ATLAS WORLDWIDE AVIATION LOGISTICS, INC.,<br><br>Debtors. | ) ) ) ) ) ) ) ) ) ) ) ) ) | Case Nos. 04-10792-BKC-RAM through 04-10796-BKC-RAM<br><br>(Jointly Administered under Case No. 04-10792-BKC-RAM) |
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF POLAR AIR CARGO, INC.,<br><br>Appellant,<br><br>v.<br><br>ATLAS AIR WORLDWIDE HOLDINGS, INC., ATLAS AIR, INC., POLAR AIR CARGO, INC., AIRLINE ACQUISITION CORP. I, AND ATLAS WORLDWIDE AVIATION LOGISTICS, INC.,<br><br>Debtors. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | 04-CV-20898 |

DECLARATION OF MICHAEL J. REILLY IN SUPPORT OF
THE AD HOC COMMITTEE OF CLASS A CERTIFICATE HOLDERS'
MOTION FOR ENTRY OF AN ORDER AUTHORIZING INTERVENTION
PURSUANT TO SECTION 24 OF THE FEDERAL RULES OF CIVIL PROCEDURE

I, MICHAEL J. REILLY, hereby declare under penalty of perjury as follows:

1.     I am an attorney seeking admission to practice law *pro hac vice* before this Court and a partner at Bingham McCutchen LLP, counsel to certain holders of Series A Pass-Through Trust Certificates (the "**Class A Certificate Holders,**" a majority in interest of which comprise

the "**Ad Hoc Committee**"). I submit this declaration in support of the Ad Hoc Committee's motion for intervention pursuant to section 24 of the Federal Rules of Civil Procedure.

2.     The EETC transactions involve twelve EETC 747-400 aircraft (the "**EETC Aircraft**"). Each EETC Aircraft is equipment within the meaning of section 1110(a)(3) of the United States Bankruptcy Code, title 11 of the United States Code (the "**Bankruptcy Code**") and, therefore, creditors providing financing in connection with the EETC Aircraft are entitled to the benefits accorded by section 1110 of the Bankruptcy Code. Each aircraft's record owner issued equipment notes in three tranches (designated as A, B & C) to finance a majority of each aircraft's cost on a nonrecourse basis. Equity investors, known as "owner participants," financed the remainder of the cost of each of the ten leased aircraft. Atlas Air, Inc. ("**Atlas**") leases ten of the EETC Aircraft from their record owners, each an "owner trustee." Atlas is the outright owner of the remaining two EETC aircraft. The equipment notes for the two Atlas-owned aircraft are fully recourse to Atlas and assume the same structure as described above with respect to the ten leased EETC aircraft.

3.     Liens on the EETC Aircraft secure the equipment notes. The Class A Certificate Holders, by a majority vote under the operative documents, control the decision to foreclose the liens.

4.     The debt evidenced by the equipment notes was funded under three separate transactions in 1998 (five aircraft), 1999 (five aircraft), and 2000 (two aircraft) in which public enhanced equipment trust certificates (the "**Certificates**") were issued to investors that provided financing for the EETC Aircraft. Similar to the equipment notes, the Certificates were issued under the trusts (each a pass-through trust) in A, B, and C tranches. The equipment notes are held for the benefit of the pass-through trusts.

5.     The Class A Certificate Holders are effectively and beneficially "secured" parties for whose benefit the equipment notes, and all collateral therefor (including mortgages of the aircraft), were issued and granted (the "**EETC Transactions**").[1]

6.     After a default under the documents evidencing the EETC Transactions, the holders of a majority of the Class A Certificates have broad powers as to the use or disposition of the EETC Aircraft.

7.     In or about April 2003, at the request of Atlas, holders of a majority in interest of the Class A Certificates formed the Ad Hoc Committee to address certain concerns regarding Atlas's financial condition.

8.     Thereafter, in July 2003, Atlas failed to make certain lease payments and defaulted under the EETC agreements.  Following the July default, Atlas and the Ad Hoc Committee entered into an agreement which, among other things, provided for the Class A Certificate Holders to forbear, on the conditions set forth such agreement, from exercising remedies prior to September 30, 2003.  This forbearance date was periodically extended as negotiations continued.

9.     Negotiations continued between Atlas, the Ad Hoc Committee, and various EETC trustees regarding a term sheet executed and delivered on September 12, 2003 (as amended from time to time and as more specifically detailed in the EETC Stipulations, the "**EETC Term Sheet**")[2] which ultimately contemplated certain amendments to the EETC leases and related

---

[1] The Debtors have provided a summary description of the financial and legal structure of the EETC Transactions as Exhibit A to the Deferred Rent DIP Motion (Bankruptcy Docket No. 96).

[2] The parties negotiated a term sheet for each of the 1998, 1999 and 2000 EETC Transactions.  Each of the term sheets is similar in all material respects and shall collectively be referred to as the "EETC Term Sheet."

C_DOCS_1585668_2

documents in light of the Debtors' inability to pay the contract rent and other principal payments as they became due.  Among other things, the heavily negotiated EETC Term Sheet required that the stipulations under section 1110 (the "**EETC Stipulations**")[3/] generally provide for (a) Atlas's continued use of the EETC Aircraft for a set period of time upon the satisfaction of certain conditions, (b) the payment of reduced rent on the EETC Aircraft during the bankruptcy case, and (c) permitting Atlas to satisfy its obligation under section 1110 to cure certain defaults by obtaining credit through the deferral of the aggregate amount of approximately $21.7 million in rent that was due pre-petition and that, absent that extension of credit, would have had to be paid on or before March 30, 2004, the end of the sixty-day period provided under section 1110 (the "**EETC Deferred Rent**").

10.    The parties negotiated provisions of the EETC Stipulations permitting the financing of the EETC Deferred Rent through the implementation of a debtor-in-possession financing facility under section 364 of the Bankruptcy Code (the "**Deferred Rent DIP Facility**").  Under section 1110, after a statutorily mandated 60-day period, secured creditors are permitted to act to exercise their rights and remedies unless a debtor before the end of that period

---

[3/] The Class A Certificate Holders and the Debtors entered into stipulations for each of the twelve EETC aircraft.  The following motions for approval of the EETC Stipulations were filed: (i) Motion for Approval of Separate EETC Stipulations with Wells Fargo Bank Northwest N.A. (as Owner Trustee) and Wilmington Trust Company (as Indenture Trustee) under 11 U.S.C. § 1110(b) (Bankruptcy Docket No. 166); (ii) Motion for Approval of EETC Stipulation under 11 U.S.C. § 1110(b) with Wilmington Trust Company (as Indenture Trustee) Regarding Boeing 747-400 Aircraft, Tail Number N409MC (Bankruptcy Docket No. 164); (iii) Motion for Approval of EETC Stipulations under 11 U.S.C § 1110(b) with Wells Fargo Bank Northwest N.A. (as Owner Trustee) and Wilmington Trust Company (as Indenture Trustee) Regarding Boeing 747-47UF Aircraft, Tail Numbers N491MC and N493MC (Bankruptcy Docket No. 165); (iv) Motion for Approval of EETC Stipulation under 11 U.S.C. § 1110(b) with Wells Fargo Bank Northwest N.A. (as Owner Trustee) and Wilmington Trust Company (as Indenture Trustee) Regarding Boeing 747-400 Aircraft, Tail Number N496MC (Bankruptcy Docket No. 167); and (v) Motion for Approval of Separate EETC Stipulations with Wilmington Trust Company (as Indenture Trustee) and the Ad Hoc Committee under 11 U.S.C. § 1110(b) Regarding Atlas Owned Aircraft (Bankruptcy Docket No. 173).

C\DOCS\585668 2

has, among other things, cured monetary defaults.  But for the Deferred Rent DIP Facility, the Debtors would have been required to pay approximately $21.7 million to the lessors on or before March 30, 2004 to cure certain monetary defaults as a precondition to continued use of the EETC Aircraft after such date.  The Debtors advised the Bankruptcy Court that they wanted and needed to retain the use of the EETC Aircraft but that they did not possess the funds necessary to cure the approximately $21.7 million payment shortfall before the expiration of the 60-day period set forth in section 1110.  Thus, only through the Deferred Rent DIP Facility could they retain the use of the EETC Aircraft.  *See* Bankruptcy Court Transcript of March 12 & 15, 2004 at 167 (relevant portions of which are attached as Exhibit A) (the "**Transcript**").

11.     On March 12, 2004 and March 15, 2004 the Bankruptcy Court, with Judge Mark presiding, held a hearing on, among other things, Debtors' motions to approve (1) the EETC Stipulations and (2) the Deferred Rent DIP Facility.  The Bankruptcy Court heard testimony from, among others, William Bradley, vice-president and treasurer of Debtors Atlas, Polar Air Cargo, Inc., and Atlas Air Worldwide Holdings, Inc. ("**Holdings**"), Ron Lane, senior vice-president and chief marketing officer of Holdings, Wake Smith, senior vice-president of planning and business development for Holdings, and Eric Mendelsohn of Lazard Freres, and ultimately approved the EETC Stipulations and the Deferred Rent DIP Facility.  The Bankruptcy Court found the EETC Stipulations and the Deferred Rent DIP Financing to be in the best interests of the Debtors' estates and proposed business plan and necessary given the protections provided to lessors of aircraft in section 1110 of the Bankruptcy Code.  *See* Transcript at 651-52, 659.

12.     On March 26, 2004, the Polar Committee filed a notice of appeal of, among other things, the orders approving the Deferred Rent DIP Facility and the EETC Stipulations.  Polar has not yet docketed the appeal before this Court.

13.     On April 15, 2004, the Polar Committee filed the Polar Stay Motion with this Court.

14.     Attached hereto as <u>Exhibit A</u> is a true and correct copy of relevant portions of the Bankruptcy Court Transcript of March 12 & 15, 2004 at 73-79, 167, 259-61, 651-52, 659-60.

15.     Attached hereto as <u>Exhibit B</u> is a true and correct copy of the Memorandum of Law by the Ad Hoc Committee in Support of Debtors' Motions (1) for Approval of Twelve EETC Stipulations Under 11 U.S.C. § 1110(b) and (2) for Final Order Authorizing Certain Debtors to Obtain Postpetition Secured Financing Under 11 U.S.C. §§ 105(a) and 364(c) Regarding Deferred EETC Lease/Equipment Note Obligations (Bankruptcy Docket No. 369).

16.     Attached hereto as <u>Exhibit C</u> is a true and correct copy of the Omnibus Reply by the Ad Hoc Committee to Objections to the Debtors' Motions (1) For Approval of Twelve EETC Stipulations Under 11 U.S.C. § 1110(b) and (2) For Final Order Authorizing Certain Debtors to Obtain Postpetition Secured Financing Under 11 U.S.C. §§ 105(a) and 364(c) Regarding Deferred EETC Lease/Equipment Note Obligations (Bankruptcy Docket No. 384).

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: Hartford, Connecticut
April 23 , 2004

Michael J. Reilly

CHDOCS 1585668 2

atl3-12.txt
25        dictating de facto substantive consolidation, dictating


OUELLETTE & MAULDIN COURT REPORTERS, INC.    (305)358-8875

1        the terms of a plan which precludes the prospect for the
2        Polar creditors to propose and have approved a plan based
3        upon the business model which the committee believes is
4        far more viable, and which our experts will testify to.
5               All of that has been done post-petition, your
6        Honor.
7               THE COURT:  So your order today, if I'm reading
8        the lines or between the lines, would be deny the
9        financing, deny the stips, Atlas goes out of business,
10       presumably then you'd move for the immediate appointment
11       of a trustee, who tries to negotiate something within the
12       next 15 days to preserve the Polar fleet and Polar
13       continues to operate?
14              MR. BENVENUTTI:  No, your Honor, it's slightly
15       different then that.  First, with respect to the
16       airplanes, we're not asking you to deny the GECAS
17       stipulation, we're going to ask you to postpone the
18       hearing on that.  We believe that there are minimal
19       business issues that should be resolved on behalf of the
20       Polar creditors and the Polar estate with GECAS.
21              We have not had an opportunity to have any
22       discussions with GECAS because of the press of time and
23       because of the fact that things have been moving along as
24       quickly as they have, but I put the GECAS stipulations in
                        Page 74

atl3-12.txt

25    a very different category from the other matters to which

OUELLETTE & MAULDIN COURT REPORTERS, INC.    (305)358-8875

74

1    we're objecting.

2            In the first place, Polar is currently using, I

3    believe, six GECAS aircraft -- five GECAS aircraft.  It's

4    currently using five, and I think it has a sixth under

5    contract.  There are four 400s, I believe there's a 200,

6    and I think there's another aircraft which is on lease to

7    Polar from GECAS and not being used.

8            The remaining two GECAS aircraft are 400s on

9    lease to Atlas and, frankly, your Honor, from our

10   perspective, if the Atlas -- if Atlas couldn't use those

11   airplanes for whatever reasons, the business model that

12   the Polar Committee's advisors has developed would

13   accommodate the use of those, particularly, if, as Mr.

14   Cantu says, they're already cross-defaulted with the ones

15   that comprise the bulk of the Polar fleet.

16           So from our standpoint, there is a viable

17   business model --

18           AUTOMATED SPEAKER:  Has joined.

19           MR. BENVENUTTI:  -- that works with respect to

20   Polar on a stand-alone basis, and with respect to the

21   aircraft.

22           Polar has no interest in the aircraft that are

23   the subject of the other stipulations which are before the

Page 75

atl3-12.txt

24      Court today.  Our view with respect to the aircraft that

25      have been made available from Atlas is that Polar didn't


OUELLETTE & MAULDIN COURT REPORTERS, INC.    (305)358-8875

75

1       need them, shouldn't have had them, the business plan or

2       the business model on the basis of which those aircraft

3       were directed to Polar, in large part, was a mistake, was

4       a function of disregard or ignoring on the part of the

5       combined management of the separate interests of Polar.

6              We acknowledge that there is a significant

7       intercompany claim that's asserted.  We acknowledge that

8       we have to deal with it.  We believe that there is a

9       legitimate challenge to it, to a large part of it, at any

10      rate, based upon fraudulent conveyance principles, but in

11      any case, whatever that claim is, we think that the

12      creditors of Polar are far better off dealing with an

13      unsecured claim of that nature, than they would be dealing

14      with the encumbrance, the secured debt that would be

15      imposed upon Polar's otherwise unencumbered assets, as a

16      result of the matters which are before the Court today.

17             That's our position.

18             THE COURT:  It's not yet clear to me what the

19      bottom line is.  You're saying you would like to attempt

20      to negotiate something with GECAS to keep the Polar fleet.

21      What about the rest of what I suggested was the Polar

22      Committee's scenario, is that accurate?

23             Atlas shuts down and you accomplish what you're

Page 76

at13-12.txt

24      accomplishing because Polar management right now you say

25      is tainted by the overall business plan that Polar

OUELLETTE & MAULDIN COURT REPORTERS, INC.    (305)358-8875

76

1       management and its board, which is largely the Atlas

2       board, agrees to, so wouldn't you need a trustee?

3       Wouldn't you need to move quickly?

4               MR. BENVENUTTI:  Your Honor, it's not clear that

5       we would need a trustee.  The committee has taken no

6       position with respect to that.  Obviously that's something

7       the committee would need to consider.

8               We don't know what's going to happen, what would

9       happen with Atlas if the Court disallows these

10      financings.

11              THE COURT:  You don't?  They're all bluffing?

12              MR. BENVENUTTI:  Your Honor, we don't know.  We

13      don't know.  We don't know.  But with respect, your

14      Honor ---

15              THE COURT:  Wouldn't it be reasonable for me to

16      conclude that if I disapproved the post-petition financing

17      and the EETC stipulations and several of the other

18      stipulations, that Atlas goes out of business?  Am I

19      missing some logical step in that ---

20              MR. BENVENUTTI:  Your Honor, there is a risk of

21      that, yes.  I don't know how to quantify that risk.  There

22      is also the possibility of an alternative business plan

Page 77

at13-12.txt

23      for Atlas.

24              Now, we don't believe that it's our obligation to

25      attempt to establish what that business plan is, your

OUELLETTE & MAULDIN COURT REPORTERS, INC.     (305)358-8875

77

1       Honor.  We're looking at this from the perspective of the

2       fiduciary obligation that our committee owes to the

3       creditors of Polar and from that perspective, we intend to

4       present to the Court, as we've already outlined in the

5       papers, a business model which we believe is viable --

6       reasonable, viable stand-alone plan for Polar, and we

7       object to the use of Polar's assets in order to finance

8       the business plan of Atlas.

9               That is essentially what's being asked for here

10      today.

11              THE COURT:  Let's assume that everything you've

12      argued and proffered, you prove and convince me you're

13      right about the business issue, the business model, and

14      the best interest of Polar creditors, what would your

15      ideal order say at the end of today?

16              MR. BENVENUTTI:  My ideal order today, your

17      Honor, would say that various motions are denied, with the

18      exception of the GECAS stipulation, and that the GECAS

19      stipulation is deferred for further hearing on March 24th,

20      provide us with an opportunity to negotiate with GECAS in

21      the interim.

22              THE COURT:  Okay, and then what do we do on

                        Page 78

atl3-12.txt

23      Monday when Atlas is in default and has no operating
24      funds?  Presumably then they -- Atlas can't -- consistent
25      with that, Atlas can't use any of the Polar money;

OUELLETTE & MAULDIN COURT REPORTERS, INC.    (305)358-8875

78

1       right?
2               MR. BENVENUTTI:  That's correct, your Honor.
3               THE COURT:  So you say it's a risk.  It seems to
4       me, unless there's concessions, Atlas goes out of
5       business, so then what?  If you don't appoint a trustee,
6       how do you move forward on your theory that Polar is
7       better off on its own?
8               MR. BENVENUTTI:  Your Honor, if a trustee is
9       necessary to accomplish that, then we would support a
10      trustee.  Obviously, there needs to be management ---
11              THE COURT:  I'm not trying to strategize it, I'm
12      just trying to understand the alternatives.
13              MR. BENVENUTTI:  Well, your Honor, obviously
14      there needs to be management for Polar.  It's either the
15      existing management, it's new management, it's some
16      combination of both, it's a trustee with some combination
17      of both, obviously, your Honor.  Those things can happen,
18      there's no reason why those things can't happen, but we
19      did not come here with an agenda of trying to anticipate
20      or trying to persuade the Court what that should look
21      like.

Page 79

atl3-12.txt

22          THE COURT:  But don't you think I should find,

23     even if you prove to me that Polar creditors could be

24     theoretically better off, don't you think I should find

25     that there is a reasonable likelihood that that could

OUELLETTE & MAULDIN COURT REPORTERS, INC.    (305)358-8875

79

1     happen before I put Atlas out of business?

2          MR. BENVENUTTI:  A reasonable likelihood that ---

3          THE COURT:  Polar could survive on its own before

4     I put Atlas out of business, which I think is just not a

5     risk, but a pretty substantial risk if we don't move

6     forward today.

7          MR. BENVENUTTI:  Your Honor, I believe that

8     we will put on evidence that will support such a

9     finding.

10          THE COURT:  Okay.  All right.  Well we've got, I

11     think, the basics in place.

12          Do you have some witnesses?  I'd like to get into

13     the testimony and go a half hour or 45 minutes or so.

14          What can we accomplish in a half hour, 45

15     minutes, do you think?

16          MR. PARKINS:  We can get started.  I think we

17     should get started, Judge, please.

18          THE COURT:  But would you need to put on your,

19     you think your business people first?

20          MR. PARKINS:  We're going to put Mr. Bradley on

21     first, your Honor.

Page 80

at13-12.txt

21   paid, which we paid actually in July as part of the

22   forbearance agreement, which was $25 million, versus

23   the original amount owing, which was       $47

24   million.

25       Q.   So, Mr. Bradley, now that we're in

167

1   Chapter 11, if someone like the EETC lender says cure

2   all payment defaults in order to keep your airplanes,

3   how much money would we have to pay in order to cure

4   those defaults?

5       A.   Well, we would have to enter into the

6   deferred rent DIP.

7       Q.   But if we didn't have the DIP, how much

8   would ---

9       A.   It would be $21.7 million.

10       Q.   Does Atlas have $21.7 million to pay this

11   amount?

12       A.   No, it does not.

13       Q.   Would Atlas have to seek a bigger DIP --

14       A.   It would.

15       Q.   -- in order to try to pay this amount?

16       A.   It would.

17       Q.   Now, as part of the restructuring

18   agreement, in September of '03, it specifically

19   provides for deferred rent DIP, if you turn with me

20   to Page 5, paragraph e, does it not?

21       A.   Yes, it does, I see it.

22       Q.   And the first few lines of this

23   restructuring agreement provide that, I guess after

24   the defined term, the deferred rent DIP, it says,

atl3-12.txt

11     Q.   Flight ops?

12     A.   Mostly merged, except where there are

13  regulatory requirements for separation.

14     Q.   The officer team with respect to the airlines?

15     A.   All merged.  The current officers of AAWH are a

16  blend of people with Polar heritage, people with Atlas

17  heritage, and people who have come in.

18     Q.   The decisions with respect to the integrated

19  airline are made by the same officer corps?

20     A.   Yes, sir.

21     Q.   Now, Mr. Smith, tell me about what you view, as

22  the fleet planner for the airline, in the event that

23  Atlas were not to be able to keep its EETC 400

24  aircraft.

25     A.   We would take a bankruptcy reorganization that

OUELLETTE & MAULDIN COURT REPORTERS, INC.  (305) 358-8875

259

1  is on a fast track to what will, in my opinion, be a

2  successful reorganization, and turn it into a train

3  wreck.

4     Q.   Mr. Smith, with respect to the --

5          THE COURT:  Talk about mixed metaphors.

6          THE WITNESS:  No, no, that was the same

7  metaphor.  On the same track, on a good track.

8          THE COURT:  Okay, sorry.  You want to keep the

9  planes on track, is that what you're saying?

10         THE WITNESS:  Yes, sir.  I'll say whatever you

11  say.

12  BY MR. PARKINS:

13     Q.   Mr. Smith, with respect to the consequences if

14  Atlas didn't keep the 400 fleet reflected by the EETCs,

Page 242

at13-12.txt

15    if the motion for the deferred rent DIP is denied, et

16    cetera, do you have any view as to the consequences on

17    Polar if that would happen?

18        A.   It will be catastrophic for Atlas.  The 400s

19    are the core asset that the company has, and it is the

20    reason why the company will, in my opinion, complete a

21    successful reorganization.  But without 12 of the 15

22    400s that are on the Atlas side, Atlas is in big

23    trouble.

24            But, similarly, Atlas would need to pull back,

25    then, the four 400s that it has over on the Polar side,

OUELLETTE & MAULDIN COURT REPORTERS, INC.  (305) 358-8875

260

1    three wet leased, one dry leased, so Polar's 400 fleet

2    will reduce almost in half.

3            As we've heard earlier today, there's no

4    assurance that Polar will be able to hold on to the five

5    aircraft that it leases in.  After all, GE has its own

6    views as to whether they want to continue with those

7    deals, but, also, as I understand it, Atlas is a

8    guarantor on those Polar leases, and if Atlas is no

9    longer in a position to guarantee them, that abrogates

10    the leases.

11            So Polar scaling back and returning to the

12    money-losing smaller formulation that it was in

13    previously, I think is a very bad plan for Polar.  So I

14    think this is a train wreck all the way around.

15        Q.   Now, Mr. Smith, how is scheduled service doing

16    today under the November plan and under the fleet plan

17    that you worked on?

18        A.   We are on track, at this point, to break even

                    Page 243

at13-12.txt

19    in scheduled service in 2004, and that would be the

20    first time, insofar as I'm aware, in the last decade,

21    although I don't want to pretend that my personal

22    knowledge goes back that far, but I'm unaware that Polar

23    has ever made money, except, perhaps, some time in the

24    mid-nineties.  So to break even this year, I think,

25    would be a substantial achievement for Polar, and we

OUELLETTE & MAULDIN COURT REPORTERS, INC.  (305) 358-8875

261

1     have high expectations for the business thereafter.

2         Q.    Now, with respect to Polar's fleet that it is

3     operating -- which is more than just the 12 aircraft,

4     correct?

5         A.    Yes, sir.

6         Q.    Are there other opportunities that Polar would

7     either keep or lose if its fleet was sized down?

8         A.    Sure.  Polar has transformed itself by virtue

9     in great measure of the fleet modernization that has

10    taken place at Polar since its acquisition by Atlas, as

11    well as the much expanded service footprint that Polar

12    has put in place, the increases in reliability that it's

13    put in place.  By virtue of all of that, Polar has gone

14    to being, once again, a very good operation within the

15    Atlas larger holding company, but that, in turn, has had

16    several foreign cargo carriers approach Atlas about the

17    prospect of substantial international alliances, which

18    alliances we think would be an enormous home run for

19    Polar in the long run.

20        Q.    And you believe that Polar is postured to take

21    advantage of these alliances because of the present

22    operations and its position within Atlas or what?

Page 244

651

1    portion of Mr. Mendelsohn's opinion dealing with the

2    sensitivity analysis and the assumptions that would

3    create 20 million dollars in borrowing need for Polar,

4    which are probably exaggerated.  However, there

5    certainly is an overall need for financing, and whether

6    or not the debtors' projections and need to reserve

7    foreign currency that's overseas in coming up with its

8    needs, there is certainly an overall need for financing

9    which will likely include Polar, or at least to have a

10   credit facility available during a Chapter 11 is, as Mr.

11   Bradley testified, a prudent move.

12           Having determined that the financing was

13   necessary at the senior level, the necessity for the

14   deferred rent financing really comes down to the EETC

15   stipulation, and it's part and parcel of the

16   stipulation.  The debtor doesn't have the cash and won't

17   have the cash from the senior facility to pay the 21.7

18   million needed to cure the defaults under the EETC

19   facilities.  Therefore, it is necessary and appropriate

20   to come up with a mechanism as part of the stipulation

21   to finance that obligation, and the debtor has put on a

22   sufficient showing that both the EETC stipulation is

23   necessary and appropriate and that the financing along

24   with it is also necessary.

25           The Polar committee in large part has

OUELLETTE & MAULDIN COURT REPORTERS, INC.  (305) 358-8875

1    criticized the debtor and attacked the motions, arguing

2    that the debtor management did not pursue a stand-alone

3    Polar facility even if it, perhaps, could not obtain a

4    satisfactory independent facility for Atlas.  I disagree

5    and find no fault in the debtor holding company, the

6    parent company and its subsidiaries, pursuing a

7    collective plan for the two operating entities.  To the

8    contrary, it would have been irresponsible for the

9    directors of the parent to pursue a plan solely for

10   Polar if that plan would result in the shutdown of Atlas

11   if, as the debtors have established, there's an

12   integrated plan that will preserve both entities.

13           One of the overriding themes, I guess, in the

14   presentation and in the Court's findings are the time

15   pressures under 1110.  We don't have the luxury of

16   elongated negotiations.  An air cargo case or an airline

17   case may not permit typical negotiations between the

18   committees and the debtors to hammer out deals that may

19   take all of the interested parties' views and interest

20   and potential leverage into account.

21           We have what I reasonably believe and find to

22   be two choices, either approve the financing

23   stipulations that require and provide for Polar to

24   pledge assets to secure the financing, and, as well, as

25   a term of the 1110 modifications, cross guarantee, or

         OUELLETTE & MAULDIN COURT REPORTERS, INC.  (305) 358 8875

1    nine planes required under the Laird plan.

2              In fact, although Mr. Mathis believed that GE,

3    acting rationally, would make a deal, as it turns out,

4    the two additional planes that are leased to Atlas are

5    not the same two additional planes that would be needed

6    under the Laird plan, because the Laird plan assumes two

7    additional 747 200s, not 400s.

8              In any event, Mr. Mathis, like Mr. Laird, may

9    be accurate in his predictions, but they're just

10   assuming certain things would be done by the lenders.

11   There's no deals in place and, under the circumstances,

12   of course, it wouldn't have been possible for him to

13   opine otherwise.

14             As I noted before the cross-examination, I'm

15   accepting for purposes of this ruling that if Polar had

16   deals in place to operate nine planes and was able to

17   implement operationally that plan with new management or

18   a trustee without substantial business interruption and

19   the loss of its customers, Polar could, given its actual

20   asset base, obtain financing.

21             I don't, however, accept or adopt the

22   conclusion that the DIP loan is not in the best

23   interests of the Polar creditors.  Rather, I find that,

24   given the choice, an integrated deal which is in place

25   viewed against an independent course of action with

              OUELLETTE & MAULDIN COURT REPORTERS, INC.   (305) 358 8875

```
1    significant contingencies, the Polar creditors are

2    better off with these deals approved.

3              I note that, as with Mr. Laird, I certainly

4    found Mr. Mathis credible and wise and experienced in

5    general restructurings. He may be right in his

6    predictions that GE would lease the six planes to Polar

7    and not exercise the cross default provisions. He may

8    be right, although, frankly, I doubt it, that if I deny

9    the DIP and 1110 motions, the lenders would also

10   renegotiate deals with Atlas.

11             As we got down to the bottom line, and it

12   wasn't meant to be a cynical or flip analogy, it was

13   meant to reflect the position that I believe the Court

14   is asked or has been presented with, should I bet all of

15   Atlas's chips on the belief that the lenders are

16   bluffing? Mr. Mathis says yes. I say no.

17             So the bottom line is this. Even assuming that

18   Polar has more unencumbered assets, even assuming that

19   more of Polar's cash will be used in the short run to

20   service Atlas obligations than Polar obligations, even

21   assuming that, perhaps, a panel of business school and

22   aviation experts could look at competing hypotheticals

23   and recommend a stand alone Polar, that's just not, in

24   the context of where we are, a viable, supportable basis

25   to justify a legal ruling in this case, denying the
```

OUELLETTE & MAULDIN COURT REPORTERS, INC.   (305) 358-8875

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**www.flsb.uscourts.gov**

| | | |
|---|---|---|
| In re: | § | (Chapter 11) |
| | § | |
| **ATLAS AIR WORLDWIDE HOLDINGS,** | § | **Case Numbers 04-10792-BKC-RAM** |
| **INC., ATLAS AIR, INC.,** | § | **through 04-10796-BKC-RAM** |
| **POLAR AIR CARGO, INC.,** | § | |
| **AIRLINE ACQUISITION CORP. I, AND** | § | **(Jointly Administered under** |
| **ATLAS AIR WORLDWIDE AVIATION** | § | **Case Number 04-10792-BKC-RAM)** |
| **LOGISTICS, INC.,** | § | |
| | § | |
| **Debtors.** | § | |

**MEMORANDUM OF LAW BY THE AD HOC COMMITTEE OF CLASS A
CERTIFICATE HOLDERS IN SUPPORT OF DEBTORS' MOTIONS (1) FOR
APPROVAL OF TWELVE EETC STIPULATIONS UNDER 11 U.S.C. § 1110(b)
AND (2) FOR FINAL ORDER AUTHORIZING CERTAIN DEBTORS TO OBTAIN
POSTPETITION SECURED FINANCING UNDER 11 U.S.C. §§ 105(a) AND 364(c)
REGARDING DEFERRED EETC LEASE/EQUIPMENT NOTE OBLIGATIONS**

Certain holders of Series A Pass-Through Trust Certificates (the "**Class A Certificate
Holders**," of which a majority in interest comprise the "**Ad Hoc Committee**"),[1] by and through
its undersigned counsel, hereby files this memorandum of law (the "**Memorandum**") in support
of the Debtors' Motions (1) for Approval of Twelve EETC Stipulations Under 11 U.S.C.
§ 1110(b) (the "**1110 Motions**"[2]) and (2) for Final Order Authorizing Certain Debtors to Obtain

---

[1] Counsel for the Ad Hoc Committee will file a statement pursuant to Rule 2019 of the Federal Rules of
Bankruptcy Procedure before the hearing on March 12, 2004.

[2] The Class A Certificate Holders and the Debtors entered into stipulations for each of the twelve EETC
aircraft (collectively, the "**EETC Stipulations**"). The following motions for approval of the EETC Stipulations
were filed: (i) Motion for Approval of Separate EETC Stipulations with Wells Fargo Bank Northwest N.A. (as
Owner Trustee) and Wilmington Trust Company (as Indenture Trustee) under 11 U.S.C. § 1110(b) (Docket number
166); (ii) Motion for Approval of EETC Stipulation under 11 U.S.C. § 1110(b) with Wilmington Trust Company (as
Indenture Trustee) Regarding Boeing 747-400 Aircraft, Tail Number N409MC (Docket number 164); (iii) Motion
for Approval of EETC Stipulations under 11 U.S.C § 1110(b) with Wells Fargo Bank Northwest N.A. (as Owner
Trustee) and Wilmington Trust Company (as Indenture Trustee) Regarding Boeing 747-47UF Aircraft, Tail
Numbers N491MC and N493MC (Docket number 165); (iv) Motion for Approval of EETC Stipulation under 11
U.S.C. § 1110(b) with Wells Fargo Bank Northwest N.A. (as Owner Trustee) and Wilmington Trust Company (as
Indenture Trustee) Regarding Boeing 747-400 Aircraft, Tail Number N496MC (Docket number 167); and

CHDOCS 3580517 4

Postpetition Secured Financing under 11 U.S.C. §§ 105(a) and 364(c) Regarding Deferred EETC Lease/Equipment Note Obligations (Docket number 96) (the "**Deferred Rent DIP Motion**" and, together with the 1110 Motions, the "**Motions**"), and represents as follows:[v]

### Introduction

1.      Several parties have objected to, and in the case of the Official Committees, will likely object to, the entry of orders approving the EETC Stipulations and the Deferred Rent DIP.[4] The Ad Hoc Committee submits that, under the plain language of section 1110, the applicable case law as discussed herein, and the economic realities of these chapter 11 cases, all such objections simply miss the point and should be overruled.

2.      The Debtors and the Official Committees face a stark, but seemingly obvious choice from among three options:

> Option 1:  The Debtors *could* cure arrearages under the EETC aircraft leases and begin paying rent in full going forward (requiring payment of approximately $22 million in overdue rent);
>
> Option 2:  The Debtors *could* surrender the aircraft and cease doing business; or
>
> Option 3:  The Debtors *could* enjoy rent deferrals on the exact terms and conditions set forth in the EETC Stipulations and EETC Term Sheet.

3.      In light of these options, there should be no controversy before this Court. The Debtors have represented to the Court that they do not have the money to make the payments that Option 1 would require. Option 2 would assuredly mean that the Debtors' unsecured

---

(v) Motion for Approval of Separate EETC Stipulations with Wilmington Trust Company (as Indenture Trustee) and the Ad Hoc Committee under 11 U.S.C. § 1110(b) Regarding Atlas Owned Aircraft (Docket number 73).

[3]  To the extent that capitalized terms are used herein and not otherwise defined, they shall have the meaning as set forth in the EETC Stipulation and the Deferred Rent DIP Motion.

[4]  The Ad Hoc Committee will reply to the objections before the hearing on March 12, 2004.

C:\DOCS 1580512 4

creditors would receive no recovery. Option 3 is the only viable choice for a chance at reorganization. How can the Ad Hoc Committee be criticized for making accommodations that give the unsecured creditors a chance to participate in a reorganization, rather than a liquidation, especially when such accommodations are the product of line by line, word by word, arms' length negotiations? Indeed, any such criticism would be unfounded, given that the market value of the EETC Aircraft exceeds the Class A Certificate Holders' debt, making foreclosure an attractive alternative.

4.   The EETC Stipulations that are now before the Court set forth the *only* terms the Ad Hoc Committee will support for the continuation of the EETC aircraft leases with the Debtors past March 30, 2004, short of receiving full cure and assumption. Under section 1110 of the Bankruptcy Code, no one, including the Debtors, the Official Committees, other parties in interest, or even, respectfully, the Court itself, can extend the Debtors' right to continue to use the aircraft beyond March 30 without the Ad Hoc Committee's agreement. If the EETC Stipulations are not approved in their entirety, the Ad Hoc Committee will be forced to direct the indenture trustee to foreclose immediately on the EETC aircraft after March 30 in accordance with its statutory and contractual rights.

5.   What is at stake in the Motions cannot be overemphasized. The twelve Boeing 747-400 aircraft at issue under the EETC Stipulations are the Debtors' premier aircraft. They are the newest, most energy-efficient, and valuable aircraft that the Debtors have in their fleet. In fact, as the Debtors have stated repeatedly, both before and during these chapter 11 cases, the EETC aircraft comprise a key portion of the "core fleet" and are nothing less than essential to their ability to reorganize as operating companies. Said another way, without the EETC aircraft,

the Debtors would face certain liquidation, and the Debtors' unsecured creditors likely would receive no distributions.

6.     However essential the EETC aircraft are to the Debtors' business operations, a simple fact emerged in 2003 that continues to this day: the Debtors lack the financial wherewithal to service the EETC aircraft leases at their contractual rates. Indeed, the Debtors' business plan is predicated on obtaining the rent and note payment deductions contemplated in the EETC Stipulations. Moreover, under section 1110 of the Bankruptcy Code, the Debtors' ability to use the EETC aircraft in chapter 11 lasts only 60 days, unless the Debtors either cure all outstanding lease payments (something the Debtors are unable to do), or reach an agreement with the EETC lessors concerning the Debtors' use of the aircraft after the 60-day statutory stay expires. Absent such a full cure payment, or an agreement for an extension, the Debtors have no right to keep the EETC aircraft for more than 60 days after commencing chapter 11.

7.     In this context, the Debtors and their professionals, along with the Ad Hoc Committee and its professionals, set out beginning in April 2003 to negotiate Atlas's restructuring that, if successful, would restructure certain of the EETC lease payments to enable the Debtors to continue their operations. Those negotiations resulted in term sheets among the parties that, in addition to numerous other terms and conditions, provide for a deferral of $21.7 million of EETC lease and note payments, or approximately $1.8 million per aircraft during the term of each EETC stipulation, that otherwise would have been due to the lessors as cure payments during the first 60 days of the Debtors' bankruptcy cases. Under the EETC term sheet, rental payments will be $725,000 per month per EETC aircraft, rather than the substantially higher sum that would otherwise be due as basic rent. Similarly, under the Deferred Rent DIP,

the $21.7 million in rental payments that would otherwise be due and owing before March 30 are treated as a debtor-in-possession credit accommodation under section 364 from the lessors to the Debtors, providing liquidity to the Debtors in their time of need.

8.      In accordance with the prepetition term sheet and the clear requirements of section 1110, this Court's approval of the Motions is a precondition to the contemplated restructuring between the Debtors and their EETC aircraft lessors.  Absent that approval, the EETC lessors will take possession of, and pursue foreclosure on, their EETC aircraft as early as March 31, 2004.

**Background**

**A.      The EETC Structure**

9.      The EETC transactions involve twelve EETC 747-400 aircraft (the "**EETC Aircraft**").  Each aircraft's record owner issued equipment notes in three tranches (designated as A, B, & C) to finance 80% of each aircraft's cost on a nonrecourse basis.  Equity investors, known as "owner participants," financed the remaining 20% of the cost of each of the ten leased aircraft.  Atlas leases ten of the EETC Aircraft from their record owners, each an "owner trustee."  Atlas is the outright owner of the remaining two EETC aircraft, and Atlas issued similar equipment notes with respect thereto.  The equipment notes for the two Atlas-owned aircraft are fully recourse to Atlas and assume the same structure as described above with respect to the ten leased EETC aircraft.

10.      Liens on the EETC aircraft secure the equipment notes.  The Class A Certificate Holders, by a 51% vote under the operative documents, control the decision to foreclose the liens.

11.     Atlas acquired the use of and financing for the EETC Aircraft under three separate transactions in 1998, 1999, and 2000 in which public enhanced equipment trust certificates (the "**Certificates**") were issued to investors that provided financing for the EETC Aircraft.  Similar to the equipment notes, the Certificates were issued under the trusts (each a pass-through trust) in A, B, and C tranches.  The equipment notes are held for the benefit of the pass-through trusts.

12.     The Class A Certificate Holders are effectively "secured" parties for whose benefit the equipment notes, and all collateral therefor (including mortgages of the aircraft), were issued (the "**EETC Transactions**").[5]

13.     After a default under the documents evidencing the EETC Transactions, a majority of the Class A Certificate Holders have broad powers as to the use or disposition of the EETC Aircraft.

## B.     Restructuring Negotiations

14.     On or about March 2003, at the request of Atlas, holders of a majority in interest of the Class A Certificates formed the Ad Hoc Committee to address certain concerns regarding Atlas's financial condition.

15.     Thereafter, in July 2003, Atlas failed to make certain lease payments and defaulted under the EETC agreements.  Following the July default, Atlas and the Ad Hoc Committee entered into a forbearance agreement which, among other things, provided for an

---

[5]  The Debtors have provided a summary description of the financial and legal structure of the EETC Transactions as Exhibit A to the Deferred Rent DIP Motion (Docket number 96).

CH DOCS 1580517 4

extension to September 30, 2003 regarding the late lease payments. Additional forbearance periods followed as negotiations continued.

16.     Over the course of the following seven months, negotiations continued between Atlas, the Ad Hoc Committee, and various EETC trustees regarding a term sheet (as amended from time to time and as more specifically detailed in the EETC Stipulations, the "**EETC Term Sheet**")[6] which ultimately contemplated certain amendments to the EETC leases and related documents in light of the Debtors' inability to pay the contract rent and other principal payments as they became due. Among other things, the heavily negotiated EETC Term Sheet required that the stipulations under section 1110 generally provide for (a) Atlas Air's continued use of the EETC Aircraft, (b) the payment of reduced rent on the EETC Aircraft during the bankruptcy case, and (c) the deferral of the aggregate amount of $21.7 million in rent that was due pre-petition and otherwise would need to be paid on or before March 30, 2004 (the "**EETC Deferred Rent**").

17.     The parties negotiated provisions of the EETC 1110 Stipulations permitting the financing of the EETC Deferred Rent through the implementation of a debtor-in-possession financing facility under section 364 of the Bankruptcy Code (the "**Deferred Rent DIP Facility**"). But for the Deferred Rent DIP Facility, the Debtors would need to pay at least $21.7 million to the lessors on or before March 30, 2004 as a precondition to continued use of the EETC Aircraft after such date. The Debtors have advised the Court that they do not possess the

---

[6] There was a term sheet negotiated for each of the 1998, 1999 and 2000 EETC Transactions. Each of the term sheets is similar in all material respects and shall collectively be referred to as the "EETC Term Sheet."

7

funds necessary to cure the $21.7 million payment shortfall before the expiration of the 60-day period set forth in section 1110.

18.     If approved by the Court, the EETC Stipulations will extend the 60-day period set forth in section 1110(a)(1) and (a)(2) until the earlier of (a) the date that is 180 days after the petition date, (b) the effective date of the Amendments (as defined in the EETC Stipulations) upon the confirmation of the Debtors' plan of reorganization, or (c) the date on which the EETC Stipulations terminate under their own terms.  The EETC Stipulations provide that the Debtors will make all payments due under the EETC term sheet in lieu of the basic rent and other amounts otherwise owing under the EETC operative documents.  Specifically, under the term sheets, the Debtors will pay an average of $725,000 per month (rather than a significantly higher sum that would otherwise be due) per leased aircraft during the pendency of the Debtors' chapter 11 cases.  Among other requirements, the Debtors must also have (i) entered into maintenance contracts consistent with preserving the value of the leased aircraft, and (ii) made and continue to make certain engine maintenance payments into escrow.

## Discussion

**A.     The EETC Stipulations Are the Debtors' Only Means to Defer Paying $21.7 Million to the Lessors on or before March 30**

19.     Section 1110 of the Bankruptcy Code presents a debtor with what a leading treatise calls a "stark choice: either perform and cure the relevant contractual obligations [in accordance with the terms of the applicable security agreement, lease or conditional sales agreement] or surrender the [aircraft] equipment." Lawrence P. King, 7 *Collier on Bankruptcy*, ¶ 1101.01 (15th ed. rev. 2003); *see also generally GATX Leasing Corp. v. Airlift Int'l, Inc. (In re Airlift Int'l, Inc.)*, 761 F.2d 1503, 1511-12 (11th Cir. 1985).

20.     Moreover, this "stark choice" is "not limited or otherwise affected by any other provision of . . . [title 11] or by any power of the court." 11 U.S.C. § 1110(a)(1). In fact, the only flexibility in what can be called the "cure or surrender" choice set forth in section 1110(a) is the ability of the trustee and its lessor, under section 1110(b), to "agree, subject to the approval of the court, to extend the 60-day period specified in subsection (a)(1)." 11 U.S.C. § 1110(b). In the typical case, the price of extension would be payment of the full cure amount owed, plus adequate assurance of the debtor's continuing ability to pay.

21.     Accordingly, section 1110 of the Bankruptcy Code could not be clearer. Debtors must either cure all amounts due and owing in connection with their aircraft equipment, or surrender possession of the equipment. The 60-day period in section 1110 cannot be extended beyond the statutory limit without the agreement of the lessor and lessee. *See In re Pan Am Corp.*, 124 B.R. 960, 974 (Bankr. S.D.N.Y. 1991) ("[T]his Court is explicitly prohibited from extending the 60-day period under section 1110 unless the interested parties so agree"), *aff'd*, 125 B.R. 372 (S.D.N.Y.), *aff'd*, 929 F.2d 109 (2d Cir. 1991), *cert. denied*, 500 U.S. 946 (1991). In 2000, Congress amended section 1110 to confirm that bankruptcy courts do not have the authority to extend the 1110 cure period beyond the statutory limit. *See* Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, Pub. L. No. 106-181, § 744, 114 Stat. 61 (2000).

22.     Here, the Debtors, the Ad Hoc Committee and certain other parties in interest, following months of spirited and arms' length negotiations, arrived at a "third way." The EETC Stipulations set forth a negotiated deal that allows the Debtors to continue using the EETC Aircraft following the 60-day period set forth in section 1110, notwithstanding the Debtors'

9

inability to pay full contract rentals and cure its outstanding lease payment arrearages before the expiration of the 60-day statutory period. In light of the Debtors' financial difficulties, the Ad Hoc Committee and the Debtors agreed to reduce the monthly rent on each EETC Aircraft by a significant amount that otherwise would have to have been paid before March 30, thereby freeing up a total of $21.7 million in additional capital for the Debtors' restructuring. The Ad Hoc Committee and the Debtors believe that approval of the EETC Stipulations will put the Debtors in the best possible position to propose a successful reorganization.

**B.      Approval of the Deferred Rent DIP Is Consistent with the Purpose of Section 364 of the Bankruptcy Code**

23.      The Debtors must repay the $21.7 million owed in post-due lease payments under the terms of the Deferred Rent DIP. As set forth in the EETC Term Sheet and the EETC Stipulations, this Court's approval of the Deferred Rent DIP within 45 days of the petition date is a condition for the lessors' agreement to extend the lease payment terms.

24.      Under section 364(c) of the Bankruptcy Code, a debtor may seek authority to enter into a post-petition secured financing arrangement which provides for, among other things, a superpriority claim over all other administrative expenses, a lien on unencumbered property of the debtor and a junior lien on encumbered property of the debtor. 11 U.S.C. § 364(c).

25.      The policy behind 364(c) is to encourage creditors to extend additional post-petition credit to debtors so the debtors can continue to operate their businesses and maximize the return to all creditors. *See In re Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 834 F.2d 599, 603 (6th Cir. 1988) ("Section 364 is designed to encourage post-petition financing by authorizing security in the debtor's assets and giving the lender priority over administration costs."). Recognizing the risks to creditors of

lending to debtors, Congress provided for certain enumerated protections listed in 364(c).  *See Ohio Farmers Ins. Co., v. Hughes-Bechtol (In re Hughes-Bechtol, Inc.)*, 117 B.R. 890 (Bankr. S.D. Ohio 1990) (enforcing a superpriority lien in a financing agreement against a pre-petition lien holder).  The alternatives provided for in section 364(c) are not exclusive and courts have long authorized provisions and conditions to post petition financing arrangements which are not on the list, but have been shown to be a part of the overall "package" negotiated by the parties.  *See Ellingsen MacLean Oil Co.*, 834 F.2d at 602 ("This aspect of the order [which provided for settlement of controversies over the lender's pre-petition liens] does not fit neatly into any of the aforesaid categories of section 364.  It did not precisely create a new lien or priority; instead it prohibited challenges to the validity of already existing liens.  This aspect of the order, however, was part of the whole 'package' authorized under section 364(c)."); *In re Florida West Gateway, Inc.*, 147 B.R. 817, 819 (Bankr. S.D. Fla. 1992) ("Although 11 U.S.C. § 364 enumerates some incentives that a court may grant to post-petition lenders, the list is not exhaustive.  Courts frequently have authorized the use of inducements not specified in the statute where a more traditional 364(c) arrangement may not suffice.").

26.     While courts generally hold that section 364 security only applies to post-petition debt, that is indeed the type of debt being secured here.  Sixty days following the filing of the Debtors' petitions, the EETC Deferred Rent is due and payable to the lessors if the Debtors wish to continue to make use of the EETC Aircraft.  *See* 11 U.S.C. § 1110.  The EETC Deferred Rent is therefore a statutory post-petition payment obligation of the Debtors if they wish to continue to use the EETC Aircraft.

27.     Section 1110 provides that a lessee of aircraft equipment must cure all past due rent on or before day 60 of the case if the debtor lessee wishes to continue using the aircraft equipment. *See BA Leasing Parties v. UAL Corp.*, Nos. 03 C 2232 & 03 C 2414, 2003 U.S. Dist. Lexis 16207, at *3 n.1 (N.D. Ill. Sept. 15, 2003) ("Under § 1110, a debtor that leases aircraft can (1) agree to perform all obligations under the lease within sixty days of the commencement of bankruptcy proceedings and cure certain defaults within certain specified time periods or (2) the debtor and the lessor can agree to extend the statutory time period to enter into agreements to avoid repossession of the aircraft. Agreements under § 1110 must be approved by the bankruptcy court."). The Debtors and the Ad Hoc Committee have negotiated an agreement in which the Debtors can continue to use and operate the EETC Aircraft, but only if the Deferred Rent DIP and the EETC Stipulations are approved by this Court within 45 days of the petition date. In the event these conditions are not met, at the end of the 60-day statutory period, the Ad Hoc Committee will have no choice but to direct the indenture trustee to take possession of the aircraft equipment as provided for in section 1110. In light of the statutory rights of lessors of aircraft equipment under section 1110, the agreement by the Ad Hoc Committee to defer the rent on the terms provided in the Deferred Rent DIP certainly provides a substantial benefit to the Debtors' estate.

### Reservation of Rights

28.     This Memorandum notwithstanding, the Ad Hoc Committee reserves the right to reply to any objections filed in opposition to the relief sought in the 1110 Motions and/or the Deferred Rent DIP Motion.

CHDOCS 1580517 4

## Conclusion

29.    For the reasons stated herein, the Motions should be granted in their entirety.

I hereby certify that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this court set forth in Local Rule 2090-1(A).

March 10, 2004

Respectfully submitted,

**GREENBERG TRAURIG P.A.**

/s/ Brian K. Gart

Brian K. Gart (Fla. Bar No. 381152)
401 East Las Olas Boulevard
Suite 2000
Fort Lauderdale, FL 33301
(954) 765-0500
gartb@gtlaw.com

-and-

**BINGHAM McCUTCHEN LLP**
F. Mark Fucci (admitted *pro hac vice*)
Michael J. Reilly (*pro hac vice* pending)
Patrick J. Trostle (admitted *pro hac vice*)
One State Street
Hartford, CT 06103
(860) 240-2700
(860) 240-2800 (fax)
mark.fucci@bingham.com
michael.reilly@bingham.com
patrick.trostle@bingham.com

Counsel to the Ad Hoc Committee of
Class A Certificate Holders

CHDOCS 1580517 4

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served (i) via electronic mail and facsimile to the list attached hereto, (ii) via electronic mail and U.S. Mail to the Debtors and The Trumbull Group, (iii) via electronic mail only upon all parties with an email address listed on the attached Master Service List dated March 8, 2004 and (iv) via U.S. Mail on all other parties listed in the attached Master Service List dated March 8, 2004 on this _____ day of March, 2004.

/s/ Brian K. Gart
Brian K. Gart , Esq.

RI-SRV01\GARTB\512007v01-3/10/04/64374.010100

C:\DOCS\15805174

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
www.flsb.uscourts.gov

| | | |
|---|---|---|
| In re: | § | (Chapter 11) |
| | § | |
| ATLAS AIR WORLDWIDE HOLDINGS, | § | Case Numbers 04-10792-BKC RAM |
| INC., ATLAS AIR, INC., | § | through 04-10796-BKC-RAM |
| POLAR AIR CARGO, INC., | § | |
| AIRLINE ACQUISITION CORP. I, AND | § | (Jointly Administered under |
| ATLAS AIR WORLDWIDE AVIATION | § | Case Number 04-10792-BKC-RAM) |
| LOGISTICS, INC., | § | |
| | § | |
| Debtors. | § | |

**OMNIBUS REPLY BY THE AD HOC COMMITTEE OF CLASS A CERTIFICATE**
**HOLDERS TO OBJECTIONS TO THE DEBTORS' MOTIONS (1) FOR APPROVAL**
**OF TWELVE EETC STIPULATIONS UNDER 11 U.S.C. § 1110(b) AND (2) FOR FINAL**
**ORDER AUTHORIZING CERTAIN DEBTORS TO OBTAIN POSTPETITION**
**SECURED FINANCING UNDER 11 U.S.C. §§ 105(a) AND 364(c)**
**REGARDING DEFERRED EETC LEASE/EQUIPMENT NOTE OBLIGATIONS**

Certain holders of Series A Pass Through Trust Certificates (the "**Class A Certificate**

**Holders**," of which a majority in interest comprise the "**Ad Hoc Committee**"),[1] by and through

their undersigned counsel, hereby file this reply (the "**Reply**") to the objections (the

"**Objections**") filed by the Official Committee of Unsecured Creditors of Atlas Air, Inc. (the

"**Atlas Committee**"), the Official Committee of Unsecured Creditors of Polar Air Cargo, Inc.

(the "**Polar Committee**" and, together with the Atlas Committee, the "**Official Committees**"),

Deutsche Bank Trust Company Americas ("**Deutsche Bank**") (Docket number 347), the United

States of America ("**United States**" or the "**Government**") (Docket number 351), Wells Fargo

Bank Northwest, National Association ("**Wells Fargo**") and DVB Bank AG ("**DVB**") (Docket

---

[1] Counsel for the Ad Hoc Committee will file a statement pursuant to Rule 2019 contemporaneously with this Reply.

CHDOCS 1580747 5

number 353), WestLB AG, New York Branch ("**WestLB**") (Docket numbers 357 and 358), and Manufacturers and Traders Trust Company ("**M&T**") and HSBC Bank USA ("**HSBC**") to the Debtors' Motions (1) for Approval of Twelve EETC Stipulations Under 11 U.S.C. § 1110(b) (the "**1110 Motions**"[2]) and (2) for Final Order Authorizing Certain Debtors to Obtain Postpetition Secured Financing under 11 U.S.C. §§ 105(a) and 364(c) Regarding Deferred EETC Lease/Equipment Note Obligations (Docket number 96) (the "**Deferred Rent DIP Motion**" and, together with the 1110 Motions, the "**Motions**"), and represent as follows:[3]

### Introduction

1.      None of the Objections presents a justification to deny the relief sought in the Motions. For the most part, the Objections filed by the Government, Deutsche Bank, WestLB, Wells Fargo/DVB, and M&T/HSBC either can be resolved with reservations of rights until confirmation, or overruled on substantive grounds. The Objections from the Official Committees, however, attempt to strike more at the core of the relief sought, but such Objections too should be overruled.

---

[2] The Class A Certificate Holders and the Debtors entered into stipulations for each of the twelve EETC aircraft (collectively, the "**EETC Stipulations**"). The following motions for approval of the EETC Stipulations were filed: (i) Motion for Approval of Separate EETC Stipulations with Wells Fargo Bank Northwest N.A. (as Owner Trustee) and Wilmington Trust Company (as Indenture Trustee) under 11 U.S.C. § 1110(b) (Docket number 166); (ii) Motion for Approval of EETC Stipulation under 11 U.S.C. § 1110(b) with Wilmington Trust Company (as Indenture Trustee) Regarding Boeing 747-400 Aircraft, Tail Number N409MC (Docket number 164); (iii) Motion for Approval of EETC Stipulations under 11 U.S.C § 1110(b) with Wells Fargo Bank Northwest N.A. (as Owner Trustee) and Wilmington Trust Company (as Indenture Trustee) Regarding Boeing 747-47UF Aircraft, Tail Numbers N491MC and N493MC (Docket number 165); (iv) Motion for Approval of EETC Stipulation under 11 U.S.C. § 1110(b) with Wells Fargo Bank Northwest N.A. (as Owner Trustee) and Wilmington Trust Company (as Indenture Trustee) Regarding Boeing 747-400 Aircraft, Tail Number N496MC (Docket number 167); and (v) Motion for Approval of Separate EETC Stipulations with Wilmington Trust Company (as Indenture Trustee) and the Ad Hoc Committee under 11 U.S.C. § 1110(b) Regarding Atlas Owned Aircraft (Docket number 73).

[3] To the extent that capitalized terms are used herein and not otherwise defined, they shall have the meaning as set forth in the EETC Stipulation, the Deferred Rent DIP Motion or the Objections.

2.      First, the Motions now before the Court set forth an agreement under section 1110

that will permit the Debtors to continue using the EETC Aircraft -- the newest and most valuable

aircraft in the Debtors' fleet – after March 30, 2004, despite its inability to pay full rent.  If the

EETC Stipulations and Deferred Rent DIP are not approved in their entirety, the Ad Hoc

Committee will insist upon full payment of all past due and future rent as required by section

1110.  Failing that, the Ad Hoc Committee will direct the indenture trustee to pursue foreclosure

on the EETC aircraft immediately after the expiration of section 1110's grace period, all in

accordance with the Ad Hoc Committee's statutory and contractual rights.  Without the EETC

Aircraft, the Debtors' business operations cannot continue, and these chapter 11 cases will

become liquidations.  Second, all the Motions seek is forbearance for four months from full

statutory compliance, on the terms and conditions noted in the EETC Stipulations.  No lease will

be amended, waived or modified by Court approval of the Motions.  Such matters will be

addressed at plan confirmation, when the Debtors move to assume the leases on a modified basis.

At that time, the consent rights of other parties will be considered and dealt with as appropriate –

but not now.  No third-party rights under a lease will be modified by approval of the Motions.

3.      Section 1110 of the Bankruptcy Code dictates this result.  If a debtor desires to

continue to use aircraft equipment for more than 60 days after the petition date, it must first

obtain an agreement with its lessor under section 1110(b).  That is the only requirement.

Nowhere does the Bankruptcy Code provide that the lessor must agree with the creditors'

committee, or any other party for that matter, in addition to the debtor.  Creditors' committees, of

course, have standing to be heard generally under section 1109, but they have no ability to force

a lessor to agree to different terms in an 1110 stipulation.  If a committee or other party in

3

interest disagrees with the agreement, it can oppose the lease extension on whatever grounds it deems appropriate, and suffer the consequences. But creditors' committees, or other parties, cannot impose their commercial likes and dislikes on the lessor, and "cherry pick" from the various negotiated terms in the lessor's agreement. The Objections from the Official Committees miss this fundamental point.

4.    The Objections also fail to recognize that the proposed stipulations provide benefits to the estate well beyond the norm in airline bankruptcies. The Ad Hoc Committee could have conditioned its agreement with the Debtors on the full payment of all outstanding amounts owed under the EETC lease, but it did not. Instead, the Ad Hoc Committee, the Debtors, and various trustees and owner participants reached an agreement that would allow the Debtors to keep the aircraft, notwithstanding the fact that the Debtors do not have sufficient funds to cure all outstanding lease payment defaults before the expiration of the 60-day period provided in section 1110. Those negotiations resulted in term sheets that provide for a deferral of $21.7 million of EETC lease payments, or approximately $1.8 million per aircraft during the term of each EETC stipulation — an amount that otherwise would have been due to the lessors as cure payments during the first 60 days of the Debtors' bankruptcy cases. The Deferred Rent DIP treats the deferred rent as a loan, and provides the typical protections to the lender that would be applicable to any DIP loan. In sum, the Deferred Rent DIP is both the price the Debtors are willing to pay for the deferral of $21.7 million of rent that otherwise would be due on or before March 30, and an accommodation that the Ad Hoc Committee is willing to make as part of its forbearance under section 1110.

**Reply**

**A.     THE ATLAS OFFICIAL COMMITTEE'S OBJECTION**

5.     The Atlas Committee objects to the Motions on three general grounds.  First, the Atlas Committee argues that the Motions, if approved, together would strip the Committee of any meaningful participation in these cases.  Second, the Atlas Committee objects to the Motions on the grounds that the aircraft leases may not be "true leases" but instead improperly perfected "secured debt."  Third, the Atlas Committee objects to the Deferred Rent DIP because it allegedly implies that the Debtors' estates should be substantively consolidated.

6.     All three arguments can be disposed of in short order.  Regarding the Atlas Committee's ability to do its job in these cases, it must first be said that nothing in the Motions seeks to deny the Atlas Committee, or any other party in interest for that matter, its right to be heard.  What the Motions *do* provide is simple confirmation of the Ad Hoc Committee's right to terminate its prenegotiated agreement if the Debtors fail to perform or the fundamental economic and timing assumptions that underlie such agreement change.  For example, the term sheets provide that the lessors can terminate their agreement if exclusivity terminates, the Debtors curtail their operations, or an examiner is appointed, all for the obvious reason that such events would only come to pass if the key assumptions underlying the prenegotiated agreement no longer remained accurate.  That is not to say that the Ad Hoc Committee will absolutely exercise its termination rights upon any such event, but it is important that it maintains the right to do so under the circumstances at that time.

7.     The plain meaning of section 1110 resolves the Atlas Committee's second objection.  In its papers, the Atlas Committee expresses concern over its "opportunity to

investigate" "true lease" issues and whether the EETC leases should be "recharacterized" as loans. Such issues, however, have not existed under section 1110 of the Bankruptcy Code for almost ten years.

8.     In 1994, Congress amended the Bankruptcy Code to clarify the law that "true lease" disputes are no longer relevant under section 1110 because the section's creditor protections are available to both lessors and lenders. According to a leading bankruptcy treatise, the 1994 amendments were "specifically intended to create a 'safe harbor' to shield aircraft 'leases' from recharactarization as security agreements." Lawrence P. King, 7 *Collier on Bankruptcy*, ¶ 1110.03[1][b] (15th ed. rev. 2003). Moreover, the legislative history from the the 1994 amendments eliminates any doubt as to this point:

> "Section 201 would effectuate a number of changes. It would amend both sections 1110 and 1168 to delete the phrase "purchase-money equipment" in order *to clarify that these sections protect all lease financing agreements and all debt financings* . . . Once this rule is fully phased in, *the distinction between leases and loans would no longer be relevant for the purposes of these sections*."

140 Cong. Rec. H. 10,767 (October 4, 1994) (emphasis added). Similarly, Congress has stated that debtors cannot "cram down" section 1110 creditors. *Id*. In any event, the indenture trustee has perfected security interests in all of the EETC Aircraft. Accordingly, regardless of whether the EETC transaction is characterized as a lease or a loan, the Ad Hoc Committee is entitled to the protections of section 1110.

9.     Finally, the Ad Hoc Committee believes that the various creditor protections it has negotiated do not lead to the inevitable conclusion that the Debtors' estates will be substantively consolidated. Whether or not the Debtors *should* be substantively consolidated is an open matter that will be determined at plan confirmation.

## B.      THE POLAR OFFICIAL COMMITTEE'S OBJECTION

10.     The Polar Committee objects to the Motions on the grounds that Polar does not require Senior or EETC DIP financing at all, and that the Polar estate should not be burdened with additional liens, administrative claims, and guaranties that allegedly benefit only Atlas.

11.     The Ad Hoc Committee believes that the Debtors will be able to show, consistent with their business judgment, that both DIPs are necessary and appropriate for the Debtors' reorganization.

12.     Moreover, the Ad Hoc Committee negotiated for the Polar guaranty and the second lien on both Atlas's and Polar's accounts receivable as part of the overall agreement with the Debtors.   The Polar Committee may not like the creditor protections that the Ad Hoc Committee obtained, but it cannot deny that each and every provision was the result of arms' length negotiations.   Nowhere does the Bankruptcy Code provide that a creditors' committee can rewrite an 1110 stipulation, or "cherry pick" from the various negotiated terms in the lessor's agreement.   The Polar Committee's objection attempts to argue legal theories in connection with what the Ad Hoc Committee and the Debtors *should* have agreed to, but the simple fact remains that the agreement is the agreement, and the only alternatives to it are full payment or foreclosure on the EETC Aircraft.

13.     The Ad Hoc Committee also disagrees with the Polar Committee's argument that the relief sought in the Motions can only be granted if the Atlas and Polar estates are substantively consolidated.   Instead, the proper reading of the Motions leaves until confirmation whether such a consolidation is warranted.

## C.   DEUTSCHE BANK'S OBJECTION

14.     Deutsche Bank, as administrative agent under two of Atlas Air's non-EETC credit facilities, objects to the Deferred Rent DIP Motion to the extent that it grants for the benefit of the Ad Hoc Committee any lien on certain "intercompany claims" or other collateral securing Deutsche Bank's credit facilities.

15.     Deutsche Bank's objection can easily be resolved for the following two reasons. First, the Deferred Rent DIP grants to the indenture trustee, for the benefit of itself and the Class A Certificate Holders, a *second* lien only on the Debtors' unencumbered assets to secure the Debtors' obligation to pay $21.7 million that otherwise would be due and owing during the 60-day grace period provided under section 1110. The Deferred Rent DIP does not seek to prime or otherwise impair whatever valid, perfected liens that Deutsche Bank or any other creditor may have in intercompany claims. Second, this simply is not the time to determine or fix Deutsche Bank's rights and claims to, or interests in, the Debtors' property.  Whatever rights, claims or interests Deutsche Bank may have in connection with the Debtors can be determined as part of the claims-allowance and plan-approval process.  Accordingly, Deutsche Bank's concerns can be addressed in a simple reservation of rights.

## D.   THE UNITED STATES' OBJECTION

16.     The United States objects to the Deferred Rent DIP to the extent that the second lien on accounts receivable granted therein for the benefit of the Class A Certificate Holders could be deemed to affect the Government's setoff and recoupment rights against the Debtors. In particular, the Government, as a contracting party with the Debtors for the use of certain aircraft, objects to "preserve its rights to setoff and/or recoup debts owed by the United States to the Debtors against debts owed by the Debtors to the United States."

17.     The Ad Hoc Committee submits that the Government's objection can be resolved through a brief clarification and a reservation of rights.   Along those lines, the Ad Hoc Committee does not seek to impair the Government's valid setoff and recoupment rights to the extent they exist under applicable law.   The Ad Hoc Committee acknowledges that the Government's setoff and recoupment rights, to the extent such rights exist under applicable law, are preserved until such time as their validity can be determined by the Court, preferably at confirmation or later as part of the claims-allowance process.   Accordingly, the Government's objections do not interfere with the relief sought in the Motions.

E.     **WESTLB'S OBJECTION**

18.     WestLB objects to one of the 1110 Motions on two grounds.[4]   First, WestLB argues that the N412MC 1110(b) Stipulation modifies without its consent certain "return conditions" set forth in the relevant lease.   Second, WestLB maintains that it is entitled to an administrative expense claim for any damages resulting from Atlas's failure to comply with the return conditions, and that such entitlement may not be waived without WestLB's consent.

19.     Both of WestLB's objections should be overruled.   WestLB incorrectly assumes that the 1110 Motions seek to amend the underlying aircraft leases.   That is not the case.   Instead, the 1110 Motions seek merely to modify certain lease terms as an interim solution under section 1110 to accommodate the Debtors' continued use of the EETC Aircraft during the 180-day period set forth in the term sheets.   At plan confirmation, the Ad Hoc Committee agrees that WestLB's consent, to the extent such a right exists under the operative documents, will be

---

[4]DVB joined in the WestLB objection on March 10, 2004, one day after the deadline for filing objections to the Motions under the Case Management Order.

relevant to effectuate an amendment of the aircraft lease going forward. But at this stage in the process, no such consent is needed.

20.     WestLB's concerns over the treatment of its potential claims are also misplaced. In particular, WestLB argues that it is entitled to an administrative claim for amounts it may be owed postpetition as a liquidity provider under the operative documents. But as WestLB is no doubt aware, WestLB's potential claims as a liquidity provider exist at the top of the EETC distribution scheme. Accordingly, WestLB stands to be paid on a non-bankruptcy priority basis from any proceeds related to the aircraft, and certainly well before the Class A Certificate Holders who are the beneficial holders of the EETC debt. Whether such claims are entitled to a priority under bankruptcy law misses the point. If, and to the extent such a claim exists, WestLB can reserve its rights with respect to the treatment of its "return condition" claim until later in the case. Moreover, if the Ad Hoc Committee were to direct the indenture trustee to foreclose on the aircraft, WestLB would receive the first proceeds of any EETC liquidation which would be more than ample to pay its claims in full. For these reasons, WestLB's objections make no sense as a factual matter, and certainly do not interfere with the relief sought in the Motions.

## F.     WELLS FARGO'S AND DVB'S OBJECTION

21.     Wells Fargo and DVB object to the Debtors' 1110 Motion in connection with the aircraft number N409MC on the grounds that the Debtors may not amend the lease without their consent, and that the 1110 Stipulations amount to a *sub rosa* plan.

22.     Contrary to Wells Fargo's and DVB's first argument, the Motions now before the Court do *not* seek to amend the underlying aircraft leases. Instead, as noted above in connection with WestLB's objection, the 1110 Motions seek merely to provide for interim payments for the

CH/DOCS:1580747.5

Debtors to continue using the EETC Aircraft during the 1110(b) statutory forbearance period. At plan confirmation, the Ad Hoc Committee agrees that DVB's right to consent, to the extent such a right exists under the operative documents, may be relevant to effectuate an amendment of the aircraft lease going forward. But at this early stage in the process, no such consent is needed for the Court to approve the relief sought in the Motions.

23.    A brief recitation of the facts makes this point clear. The Ad Hoc Committee and Atlas entered into forbearance agreements prepetition, following Atlas's payment defaults in July 2003 and January 2004. The most recent forbearance agreement is set forth in the term sheets attached to the 1110 Stipulations, and provides that the Debtors have 120 days after the expiration of section 1110's 60-day grace period to confirm a plan. If the Debtors fail to do so, the term sheets terminate automatically and no lease or other operative document would ever have been amended. Accordingly, the Motions are in the nature of a forbearance agreement, not a permanent amendment to the leases. Such an amendment will only be considered in the context of the Debtors' plan of reorganization.

24.    Wells Fargo's and DVB's argument alleging a *sub rosa* plan also fails. Section 1110(b) of the Bankruptcy Code provides that the Debtor and its equipment lessor "may agree" to extend the 60-day grace period provided for in the statute. Following months of negotiations among the Debtors, the Ad Hoc Committee, various trustees and the other owner participants, the parties reached the agreement that is now before the Court in the form of the Motions. In particular, the Ad Hoc Committee's willingness to defer payment of $21.7 million beyond the grace period set forth in section 1110 provides considerable value to the estate. In return, the Ad Hoc Committee negotiated for and received the various creditor protections set forth in the term

sheets and the Motions.  As the Ad Hoc Committee has stated all along, the Motions present the only option that the Debtors have to continue using the EETC Aircraft.  Without the use of such aircraft, the Debtors' reorganization cases will become liquidations.

25.  The terms and condition set forth in the Motions do not amount to a *sub rosa* plan for the fundamental reason that they seek approval of only the first part of the overall EETC agreement, that is, the terms under which the Debtors can continue to use the EETC Aircraft after the 1110 period expires until 180 days after the petition date.  This extension affords the Debtors the time they need to propose a confirmable plan.  Whether the long-term lease amendment will be approved will be a matter for debate at confirmation, when proposed amendments to the EETC leases are presented to all parties in interest for their consideration. But in order for there even to be an opportunity for a reorganization, the Motions must be approved first.

## G.  M&T'S AND HSBC'S OBJECTION

26.  M&T's and HSBC's objection claims that both parties, as Class B and Class C Trustees, are entitled to have their fees paid and expenses reimbursed by the Debtors.  Like many of the other objectors, M&T and HSBC also seek to reserve their rights regarding any permanent amendment to the EETC leases.

27.  Both fee requests should be considered upon appropriate application to the Court consistent with the operative documents.

28.  The Class B and Class C Trustee also seek to reserve whatever consent rights they may have with respect to any permanent amendments to the EETC leases.  The Ad Hoc Committee submits that such rights only will be relevant, if at all, during the plan confirmation

process.    M&T's and HSBC's objection therefore does not prevent the relief sought in the Motions.

## Conclusion

29.    For the reasons stated herein, the Objections should be overruled in their entirety, and the Motions should be granted in their entirety.

CTDOCS 1580747 5

I hereby certify that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this court set forth in Local Rule 2090-1(A).

March 11, 2004

Respectfully submitted,

**GREENBERG TRAURIG P.A.**

Brian K. Gart
Fla. Bar No. 381152
401 East Las Olas Boulevard
Suite 2000
Fort Lauderdale, FL 33301
(954) 765-0500
salazarl@gtlaw.com

—and—

**BINGHAM McCUTCHEN LLP**
F. Mark Fucci (admitted *pro hac vice*)
Michael J. Reilly (*pro hac vice* pending)
Patrick J. Trostle (admitted *pro hac vice*)
One State Street
Hartford, CT 06103
(860) 240-2700
(860) 240-2800 (fax)
mark.fucci@bingham.com
michael.reilly@bingham.com
patrick.trostle@bingham.com

Counsel to the Ad Hoc Committee of
Class A Certificate Holders

CTDOCS 1580747 5

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served (i) via electronic mail and facsimile to the list attached hereto, (ii)  via electronic mail and U.S. Mail to the Debtors and The Trumbull Group, (iii) via electronic mail only upon all parties with an email address listed on the attached Master Service List dated March 8, 2004 and (iv) via U.S. Mail on all other parties listed in the attached Master Service List dated March 8, 2004 on this _____ day of March, 2004.

BRIAN K. GART, ESQ.

**Debtors' Counsel:**

Leonard M. Parkins, Esq.
Sarah B. Foster, Esq.
Kenric Kattner, Esq.
Haynes and Boone, LLP
1000 Louisiana, Suite 4300
Houston, TX 77002
atlas@haynesboone.com
(713) 547-2000
(713) 236-5490 Fax

Paul Steven Singerman, Esq.
Jordi Guso, Esq.
Berger Singerman
200 S. Biscayne Boulevard, Suite 1000
Miami, Florida 33131
(305) 755-9500
(305) 714-4340 Fax

**Atlas Air Creditors Committee**

Mark I. Bane, Esq.
Mark R. Somerstein, Esq.
Keith H. Wofford, Esq.
Kelley Drye & Warren, LLP
101 Park Avenue
New York, NY 10178
(212) 808-7915
(212) 808-7897 Fax

Mindy Mora, Esq.
Scott Baena, Esq.
Bilzin Sumberg Baena Price & Axelrod
LLP
200 S. Biscayne Boulevard, Suite 2500
Miami, Florida 33131
(305) 374-7580
(305) 374-7593 Fax

**Polar Air Creditors Committee**

Laurel M. Isicoff, Esq.
Solomon B. Genet, Esq.
Kozyak Tropin & Throckmorton, P.A.
2800 Wachovia Financial Center
200 S. Biscayne Boulevard
Miami, Florida 33131
(305) 372-1800
(305) 372-3508 Fax

Joseph McLaughlin, Esq.
George M. Kelakos, Esq.
Heller Ehrman White & Mcauliffe LLP
120 W. 45th Street, 21st Floor
New York, NY 10036
(212) 832-8300
(212) 763-7600 Fax

Brent Cohen, Esq.
Peter Benvenutti, Esq.
Heller Ehrman White & Mcauliffe LLP
333 Bush Street
San Francisco, CA 94104
(415) 772-6141
(415) 772-6278 Fax

**Other Parties**

James D. Silver, Esq.
Carlton Fields, P.A.
100 S.E. 2nd Street, #4000
Miami, FL 33131
(305) 530-0050
(305) 530-0055

Lorraine S. McGowen, Esq.
Orrick Herrington & Sutcliffe, LLP
666 Fifth Avenue
New York, NY 10103
(212) 506-5000
(212) 506-5151

Roy S. Kobert, Esq.
Broad and Cassel
P.O. Box 4963
Orlando, FL 32802
(407) 839-4200
(407) 650-0927 Fax

Harold Kaplan, Esq.
Susan deResendiz, Esq.
Mark F. Hebbeln, Esq.
Gardner Carton & Douglas, LLP
(312) 569-1000
(312) 569-3000 Fax

Jon Yard Arnason, Esq.
Ronald Scheinberg, Esq.
Vedder Price Kaufman & Kammholz,
PC
805 Third Avenue
New York, NY 10022
(212) 407-7775
(212) 407-7799 Fax

Gregory Grossman, Esq.
Astigarraga Davis Mullins & Grossman,
PA
701 Brickell Avenue, 16th Floor
Miami, FL 33131
(305) 372-8282
(305) 372-8202 Fax

Frank L. Eaton, Esq.
Pedro A. Jimenez, Esq.
White & Case, LLP
200 S. Biscayne Blvd., #4900
Miami, FL 33131

Evan C. Hollander, Esq.
Scott Greissman, Esq.
White & Case LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 819-8200
(212) 354-8113 Fax

Grisel Alonso, Esq.
Assistant United States Attorney
99 N.E. 4th Street, #310
Miami, FL 33132
(305) 961-9310
(305) 530-7139 Fax

J. Christophen Kohn, Esq.
Tracy J. Whitaker, Esq.
Andrea Horozitz Handel, Esq.
Department of Justice
P.O. Box 875
Ben Franklin Station
Washington, DC 20044
(202) 307-0358
(202) 514-9163 Fax

ftl-srv01\GARTB\511860v01\3/11/04\64374.010100